J. HOWARD PORTER, JOHN C. PORTER AND PAUL D. PORTER, TRUSTEES, IDENTIFIED UNDER THE TRADE NAME PORTER PROPERTY TRUSTEES, LTD., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 95762. Promulgated September 5, 1940.

*Benjamin W. Henderson, Esq.,* and *Wilford G. Edling, C. P. A.,* for the petitioners.

*John H. Pigg, Esq.,* for the respondent.

686

OPINION.

Kern: The principal issue is whether the petitioner, Porter Property Trustees, Ltd., was an association taxable as a corporation, or a trust. On the theory that it was an association, respondent claims the personal holding company surtax and nonfiling penalty.

The question is no longer novel, having received consideration from the Supreme Court in several cases, in the latest of which, *Morrissey* v. *Commissioner*, 296 U. S. 344, the Court reviewed at length the course of its earlier decisions and the dependent Treasury regulations seeking to interpret them, and laid down criteria which must guide us here. Cf. *Swanson* v. *Commissioner*, 296 U. S. 362; *Helvering* v. *Combs*, 296 U. S. 365; *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369, all decided on the same day as *Morrissey's* case. Both parties cite the *Morrissey* case as authority for their opposite contentions. A glance at it will suffice to show the governing principles. The Court said:

"Association" implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction

of business. This is not the characteristic of an ordinary trust * * *. Such beneficiaries do not ordinarily, and as mere cestuis que trustent, plan a common effort or enter into a combination for the conduct of a business enterprise. * * * But the nature and purpose of the cooperative undertaking will differentiate it from an ordinary trust. In what are called "business trusts" the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains. Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate * * *.

The Court then went on to mention other forms of business enterprise in which the association might be used. It then pointed out that "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." "Mere formal procedure" was not to be made "a controlling test." The revenue act's definition embraces more than joint stock companies. And "while the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive." Trustees may act as directors, and the trust terms serve as bylaws. Control by the beneficiaries, the Court pointed out, had in the earlier case of *Hecht* v. *Malley*, 265 U. S. 144, been rejected as nonessential, and, hence, meetings of the beneficiaries were unnecessary, as was likewise the transferability of beneficiary interests to constitute such a group an "association." The trust mechanism, the Court said, permitted the title to property to be held by a continuing body, with centralization of management, the ready transfer of beneficial interests without affecting the trust's continuity, the spread of these interests among many participants, and the limitation of the personal liability of the participant to the property embarked in the enterprise—all advantages which flow from the nature of trusts but approximate closely those afforded by the corporation. To insist on their nature as trust advantages would be to ignore the postulate that only those trusts were sought to be assimilated to corporations for tax purposes which "have the distinctive feature of being created to enable the participants to carry on a business and to divide the gains which accrue from their common undertaking * * *."

Having laid down these principles, the Court then proceeded to examine the facts of the case before it, of a trust created for the development of a tract of land by building golf courses and club houses, surveying and selling lots, and the like, which was effected by issuing transferable certificates of beneficial interest. The Court thought it a business enterprise, even if no new tracts were acquired: "Its character was determined by the terms of the trust instrument. It was not a liquidating trust; it was still an organization for profit, and the profits were still coming in. The powers

conferred on the trustees continued and could be exercised for such activities as the instrument authorized."

The companion cases decided by the Supreme Court the same day dealt with situations not unlike that of the Morrissey trust. In *Swanson's* case, *supra*, a trust was created by two landowners, the trust *res* being an apartment house, and the assignable beneficial shares, although originally divided among the landowners, were held in the taxable year by their wives. The Court held it an "association." In the *Coleman-Gilbert* case, *supra*, five coowners of about 20 apartment houses had conveyed them to trustees, with powers to improve, lease, and sell and to pay income to beneficiaries. The Court again held the trust an "association." In *Combs's* case, *supra*, the Court thought that a trust created to finance and drill an oil well, the beneficial interest certificate holders being 13 persons, was likewise an "association."

Further citations seem unnecessary in view of the fundamental test so clearly laid down by the Supreme Court. That is, whether there is a business purpose back of the trust's creation and continuance. A glance at the history of the present trust leaves no doubt that there was here such a purpose. James Porter and his wife owned certain agricultural lands in California and Minnesota, some of which were actively farmed. In 1930 they created a corporation and took its shares in exchange for these lands, the only other shareholders being Porter's two sons, daughter and son-in-law, and an outside nominee. The use of the corporate form no doubt had its advantages, but it also had certain disadvantages from the standpoint of tax rates. In 1935 a trust was substituted for the corporation, taking over all its assets except the Porter Homestead, which apparently went to Porter's wife, for her name does not reappear among the holders of the trust's "expectancy fractions." The new trust beneficiaries are still the members of Porter's family, although their relative interests have changed somewhat since the corporation was dissolved. All these facts show, we believe, one increasing purpose to retain the advantages of centralized control, limitation of liability, and others associated with the corporate form in carrying on actively the business of farming lands and distributing the income therefrom.

We may stop a moment here to note those provisions of the trust to which petitioner points as distinguishing it from a business association. It is said that the trustees have exclusive management and may fill vacancies, and that the beneficiaries have no voice in the trust's control; that the trustees may not sell any interests in the trust estate and that the beneficiaries' interests are nontransferable;

that the trustees have had no formal meetings and that the beneficiaries have never been consulted on the affairs of the trust. The claim of nontransferability of "expectancies" has not, we think, been clearly established. But we do not think these points are vital, for they go merely to the outward form of the trust, which, on one side, may approximate the form of a corporation or, on the other, that of a strict trust; and it is not the particular form of doing business so much as the business purpose which must determine. In other words, the statute is intended to hit a trust even strict in form if it is at the same time conducted for profit. Such is the teaching in *Morrissey's* case, as we understand it. Outside the statute's reach lie trusts created to safeguard and conserve the property of widows and infants, or to liquidate such property, the so-called "ancestral" trusts. Although the beneficiaries here were the members of Porter's family, there is no evidence to convince us that the trust's primary purpose was to hold the farms during the children's infancy or liquidate them in the process of administration. In so far as appears from the testimony, none of the children was an infant when the trust was created; and the only testimony pointing toward an intention to liquidate was Porter's rather vague statement that "we would have offered it [some of the trust lands] for sale or trade if we could get what we considered right for it." The family relationship of the grantors, trustees, and beneficiaries does not in itself establish the trust as "ancestral" or determine the category in which it should fall for tax purposes any more than it would affect the corporate character or tax classification of a corporation similarly constituted. That relationship is merely evidence of the purpose of the trust, which will weigh much or little, depending on other facts and circumstances. The other facts here indicate a family corporation which it was thought could be operated as a trust under the so-called "Hulbert Plan", without paying corporate rates. In view of the principles later laid down by the Supreme Court, we think it unnecessary to discuss or attempt to distinguish the cases of *Commissioner* v. *Guitar Trust Estate*, 72 Fed. (2d) 544 (C. C. A., 5th Cir.), and *Blair* v. *Wilson Syndicate Trust*, 39 Fed. (2d) 43 (C. C. A., 5th Cir.), upon which petitioner relies. Active association of the beneficiaries together in creation of the trust is not an indispensable factor, as petitioner contends, in the creation of a business trust, especially where it is a family trust and the settlors are the father and mother; but if it should be thought so, we need look only beyond the creation of the trust to the prior corporation to find parents and children happily associated together under the form of a corporation in carrying on their farming operations. In the transmutations which followed it would seem of little moment that certain members

of the family passed from the active role of shareholders to the passive one of beneficiaries.

We are of the opinion that petitioner was an association and therefore taxable as a corporation.

Assuming, without deciding, that because petitioner was an association taxable as a corporation it should also be considered as a corporation within the meaning of section 351 (b) (1) of the Revenue Act of 1934, which defines "personal holding company", it is necessary, in order to conclude that petitioner was such "personal holding company", to find that "80 per centum of its gross income for the taxable year is derived from royalties * * *." It appears from the stipulation of the parties that petitioner's gross income for the taxable year was $74,794.64. Of this amount respondent determined that $63,596.29 was derived from oil royalties. However, it appears from the respondent's determination of deficiency that of this latter amount $50,800 represented bonuses paid to petitioner as lessor by the Standard Oil Co. and the Texas Co. As to the bonus paid by the Standard Oil Co., amounting to $46,000, we have evidence in the record and stipulations to the effect that a dry hole was drilled on the property leased, that no oil or gas was produced from the leased premises, and that three years after the taxable year the lessee reconveyed the premises to petitioner by quitclaim deed. Thus, it is apparent that the bonus received by petitioner in return for the lease in question was not paid and could not have been paid from any share in the oil or gas produced under the lease reserved by the lessor, that it was not "payable proportionately to the use made of the right by the grantee", and was not "based upon the amount of mineral or oil taken from the ground", and was not "a share of the product * * * reserved by the owner for permitting another to use the property." Therefore, we conclude that such a bonus payable to the lessor in a definite sum and in no way contingent upon or payable from the production of oil or gas from the leased premises is not a "royalty" within the meaning of section 351 of the Revenue Act of 1934. *Kiesau Petroleum Corporation*, 42 B. T. A. 69; *Logan Coal & Timber Association*, 42 B. T. A. 529. Cf. *Grace M. Barnett*, 39 B. T. A. 864. It follows that 80 per centum of petitioner's gross income for the taxable year was not derived from royalties and that petitioner was not a personal holding company within the definition of the statute. It also follows that petitioner is not liable for any penalty on account of failure to file a return as a personal holding company.

. · We turn now to the next issue. Respondent contends that petitioner derived income to the extent of $1,627.10 in the taxable year from land sale contracts, and that the evidence adduced at the hearing was insufficient to establish error in respondent's determination of this

sum. The respondent, in his deficiency notice, determined that petitioner received land contract payments in 1935 in the aggregate amount of $5,749.50, and he accordingly treated a certain percentage of each payment as representing a reportable profit during that year, with the result reached above.

The land held had been sold by the James Porter Investment Co. on the installment plan and the contracts were transferred by that corporation to the trust on February 28, 1935. The question turns on the proof of fair market value of these contracts on that basic date, and respondent submits that his determination has not been overcome by adequate proof.

Petitioner introduced evidence to the effect that the land contracts were worth on the basic date an amount not less than the face amount of the outstanding balance then due on them. James Porter testified that he had sold substantial tracts of land in Canada and about 35,000 acres in California on his own account on installment contracts, although he had never discounted them or bought them. He had, however, as a banker some knowledge of the value of such contracts put up by borrowers as collateral security. Porter testified that he knew personally the contract purchasers and the tracts sold, and that the land contracts taken over by petitioner were worth not less in the market than the face amount still due on them. James Howard Porter was then called by petitioner and testified as to the amounts due on various specific contracts on dates near February 28, 1935.

Respondent introduced no evidence on this point.

On this issue we sustain petitioner's contention.

The last question may as quickly be disposed of. Petitioner claims a deduction of $2,202.50 for the taxable year in respect of the payment in that year of that amount on account of a double liability assessment levied against the shareholders of a bank. The James Porter Investment Co. was the owner of an uncertain number of shares of the stock of the Morrison Savings Bank, of Morrison, Iowa, before February 28, 1935, which on that day were transferred to petitioner. The bank went into receivership in 1932 or 1933, and the assessment was levied on shareholders accordingly, the petitioner receiving a notice of the assessment in 1935, and it thereupon paid the sum claimed in deduction. The petitioner trust paid the assessment immediately in 1935 on the first call made upon the bank's shareholders.

This is all the evidence and it is obviously insufficient to establish this expenditure as a deductible loss. Ordinarily, the payment of an assessment on bank stock is to be considered as a contribution to capital, and is not deductible, any loss in such a case being incurred when the stock is sold or becomes worthless. *Rauncy* v. *Commissioner*, 46 Fed. (2d) 283. There is no evidence here as to when, if ever,

this stock became worthless. In this state of uncertainty we may not overturn respondent's determination as erroneous, and must, therefore, sustain it by denying the deduction.

No evidence being before us as to the deduction of $4,516.72 claimed for legal fees and expenses in the same year, it must also be denied.

*Decision will be entered under Rule 50.*