Standard Knitting Mills, Inc. v. Commissioner.
Standard Knitting Mills v. Commissioner
Docket No. 1017.
United States Tax Court
1944 Tax Ct. Memo LEXIS 23; 3 T.C.M. (CCH) 1271; T.C.M. (RIA) 44395; December 1, 1944
*23 Held, that the stock of the East Tennessee National Bank became worthless prior to 1939. The loss on account of paying bank stock assessment was sustained in 1939 and is deductible in that year. M. W. Egerton, Esq., for the petitioner. Charles P. Bagley, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined the following deficiencies against Standard Knitting Mills, Inc., for the years 1939 and 1940: 1939
1940
Income tax
$12,808.22
$16,369.48
Declared value excess
profits tax
1,788.32
4,850.19
Excess profits tax
8,840.68
Certain of the respondent's adjustments have not been contested. An issue regarding deductibility of amounts expended in improving real estate was abandoned by the petitioner at the hearing. The sole remaining issue is whether the petitioner sustained losses in 1939 or 1940 in connection with its investment in stock of the East Tennessee National Bank and the amount and character of the losses so sustained. Findings of Fact Most of the facts, consisting mainly of exhibits, were stipulated by the parties and are found to be as stipulated. The following summary of the stipulated facts, *24 together with additional facts otherwise found from the record, will suffice to present the issue involved. The petitioner is a corporation organized under the laws of Tennessee, with its principal place of business at Knoxville. Its returns for the years in controversy were filed with the collector of internal revenue for the district of Tennessee. The petitioner keeps its books and prepares its returns upon an accrual basis. On or before March 1, 1932, the petitioner acquired 346 shares of the capital stock of the East Tennessee National Bank, hereinafter sometimes referred to as the bank, at a cost of $34,600. In 1931 the bank had encountered financial difficulties. Its deposits were declining and in order for it to remain open, it was necessary for it to secure large loans. During 1932, it acquired from the Reconstruction Finance Corporation, hereinafter called RFC, loans in amounts aggregating $10,393.800. The bank's condition continued to decline and on January 19, 1933, it closed its doors. At the time of closing its capital stock consisted of 20,000 shares of the par value of $100 each. A receiver was appointed for the bank by the Comptroller of the Currency on January *25 20, 1933. On or about March 8, 1933, the receiver filed a "deficiency statement" with the Comptroller of the Currency setting forth therein the financial condition of the bank as of January 19, 1933, the date of closing. This statement disclosed assets of an estimated value of $12,038,209.70; liabilities of $18,057,192.13 and estimated expenses of receivership of $400,000 with a resulting deficit of $6,418,982.43. On April 5, 1933, the Comptroller of the Currency levied an assessment of 100 per cent against the stockholders of the bank, to be paid on or before May 12, 1933. On April 20, 1933, a plan was adopted, with the approval of the Comptroller of the Currency, for reorganization of the bank under The Bank Conservation Act of March 9, 1933 (12 U.S.C.A. 207). Under the plan, the receiver was to return to the bank all of its assets, other than those pledged to RFC, for the purpose of its transferring them to trustees who were to hold and liquidate them for the benefit of unsecured creditors and participating stockholders. The assets pledged to RFC as security were to be purchased by it for $6,539,663.92, the amount of the bank's then outstanding *26 loan from RFC. The trustees were at the same time to borrow from RFC the sum of $7,539,663.92, being an amount sufficient to purchase such assets and to provide an additional $1,000,000 to be used for the payment of receivership expenses, secured creditors and a cash distribution to unsecured creditors. The loan thus obtained was to be secured by the assets purchased, by the stockholders' notes hereinafter mentioned, and by the stock of the reopened bank, except the qualifying shares to be held by the directors of the reopened bank. The plan further provided that unsecured creditors and depositors should waive all claims against the closed bank and accept in lieu thereof a cash distribution amounting to 10 per cent of their claims, to be made from the proceeds of the RFC loan, and non-interest bearing trustees' certificates for the amounts of their claims, less the amount of such cash distribution. Secured creditors agreed to release the bank from all liability on their claims and to rely for payment solely on the pledged collateral held as security therefor. The stockholders agreed to assign and surrender to the trustees all of their stock in the bank and in lieu of paying the *27 assessment above mentioned, to execute and deliver non-interest bearing notes payable to the trustees in an amount equal to the par value of the stock owned by them, secured to the best of their ability. By their terms, these notes were payable at any time upon demand of the RFC and otherwise on January 10, 1940, unless prior to that date the unsecured creditors had received 70 per cent of their claims. It was provided that the notes would be binding obligations when the bank reopened. The stockholders further agreed to accept any and all liability imposed upon stockholders of any national banking association by any national act to the extent of their interest in the stock of the reopened bank and to indemnify and save harmless the trustees from any such liability. The outstanding capital stock of the bank was to be cancelled; the amount of its authorized capital reduced from $2,000,000 to $1,000,000, and the name of the bank changed to Park National Bank, herein sometimes called the reopened bank. From the assets in their hands the trustees were to transfer cash and acceptable assets to the reopened bank in an amount sufficient to provide its required capital of $1,000,000 and paid-in *28 surplus of $100,000, in payment and exchange for all its capital stock of $1,000,000. Any cash and acceptable assets in excess of $1,100,000 were also to be transferred to the reopened bank as a deposit to the credit of the trustees. The trustees were to be liable only as trustees to the extent of the trust funds held by them. After all prior claims had been paid the trustees were to hold and liquidate all assets acquired by them, including the stockholders' notes, stock of the reopened bank and dividends thereon, for the benefit of the unsecured creditors and the participating stockholders. If the unsecured creditors had not received 70 per cent of their claims by January 10, 1940, the stock of the reopened bank or the proceeds thereof, was to be distributed or paid to such creditors and the proceeds from the collection of the stockholders' notes, all of which matured on that date, were likewise to be paid to them until they had received 70 per cent of their claims. After the unsecured creditors had received 70 per cent of their claims, all remaining assets of the trust were to be held and liquidated for the benefit of the stockholders paying all or any part of their notes. In *29 the event the unsecured creditors had received payments equaling 70 per cent of their claims by January 10, 1940, through the liquidation of assets other than the stockholders' notes, then the notes and collateral of the stockholders were to be returned to them and the stock of the reopened bank was to be distributed among them in proportion to the amount deposited by each pursuant to the plan, subject to an assignment of one-half of all dividends thereafter paid until all the unsecured creditors received the remaining 30 per cent of their claims. On May 11, 1933, the petitioner executed and delivered to the trustees its stockholders' note in the amount of $34,600, secured by United States Government Bonds of a like face value. About the same time it assigned and surrendered to the trustees its 346 shares of the capital stock of the East Tennessee National Bank. Sometime after December 21, 1933, the petitioner was issued a "trustees' certificate of deposit of stock" evidencing such action. The plan for reorganizing and reopening the bank was declared effective on December 21, 1933, and on that date the Park National Bank was licensed to open and commence business by the Comptroller *30 of the Currency. The original balance sheet of the Park National Bank as of December 21, 1933, showed the following resources and liabilities: RESOURCES
Loans and discounts
$ 181,958.99
U.S. government bonds to secure
circulation
943,437.50
Bonds and securities
0
Stock in Federal Reserve Bank
30,000.00
Furniture and fixtures
15,000.00
Redemption fund
73,830.09
Cash
1,851,281.92
$3,095,508.50
LIABILITIES
Capital stock
$1,000,000.00
Paid-in surplus
100,000.00
Circulation
975,997.50
Deposits (trustees, East Tennessee
National Bank
1,019,511.00
$3,095,508.50
One million dollars of the cash shown on the foregoing balance sheet represented proceeds of the RFC loan, which were deposited to the credit of the trustees. All of the remaining assets shown thereon were transferred to the reopened bank by the trustees, pursuant to the plan, in payment of the capital stock of $1,000,000 and for a deposit to their credit of $19,511. In providing the requisite capital and paid-in surplus of $1,100,000, the trustees were lacking $162,447.99 of acceptable assets. This shortage was overcome by their guaranteeing the payment of $81,958.99 of theretofore unacceptable assets *31 and executing their own note for $100,000 to the reopened bank, collaterally secured by unacceptable assets. On or about December 21, 1933, RFC established a sub-office in Knoxville, in charge of a field representative, to liquidate the collateral pledged by the trustees as security for the RFC loan. This office handled all collections, compromises and settlements as well as all collateral, and other matters incident to the liquidation until the RFC loan was fully paid. On January 15, 1940, the sub-office closed. As a courtesy to the trustees, their opinion was secured as to matters of compromise, settlement and like matters. The trustees handled the liquidation of the trust assets not pledged to RFC. The liquidation of the trust was completed on or about September 15, 1943. On January 15, 1936, the trustees made a 3 per cent cash distribution to unsecured creditors, bringing the total of such distributions to 13 per cent. On the same date, printed statements were issued concerning the affairs of the trust, in which the trustees advised that no further distributions were contemplated until the RFC loan had been paid in full. Included in this statement were the following comments: *32 "THE VALUE OF YOUR CERTIFICATE "We are often asked our opinion of the future dividends to be paid. You recognize that there are too many contingencies in a liquidation of this character for us to accurately estimate what may happen. We do believe that a substantial value will be returned to us after the R.F.C. is paid - and we do believe that your certificate has a value considerably in excess of any amount which we have heard of being offered. You are entitled to an additional 57% before stockholders receive any benefit from this trust - and you should carefully consider the potential value of your certificate before you accept any offer for it." On January 15, 1937, similar printed statements were issued by the trustees in which the above comments were repeated. After the 3 per cent distribution of January 15, 1936, no further distributions were made by the trustees until January 29, 1940. Sometime prior to March 2, 1938, the trustees became involved in litigation in which they were charged, among other things, with having depressed the price of depositors' certificates. In their answer to one such petition made sometime between March 2 and April 6, 1938, the trustees set forth *33 the following concerning the value of depositors' certificates: "(1) Under the reorganization plan the first 70% of your depositors' certificates is secured by stockholders' notes and stock in the Park National Bank, subject to the prior right of any pledgee. If this security is not used to pay 70% of your certificates, then you are entitled to one-half the dividends to be paid by the Park National Bank until your remaining 30% is paid. 13% has already been paid. This leaves a balance due you of 57% secured by stockholders' notes and the capital stock of the Park National Bank. Your Trustees do not believe that this 57% can be paid without the collection of stockholders' notes and the sale in whole or in part of the stock which they own in the Park National Bank. In accordance with previous statements, they therefore believe that an additional 57% (70% minus 13%) is the maximum that depositors can hope to receive." Condensed balance sheets of the trust at September 30, 1934, March 30, 1937, December 1, 1938, and January 31, 1939, as reflected by its books, were as follows: ASSETS
Sept. 30, 1934
March 30, 1937
Dec. 1, 1938
Jan. 31, 1939
Assets pledged to RFC: Notes and judgments
$ 8,946,980.79
$ 7,796,743.78
$ 6,447,600.45
$ 6,289,464.16
Stocks and bonds
1,134,831.50
1,230,869.95
1,105,371.26
1,114,462.06
Real estate
818,267.67
968,569.27
916,758.05
953,538.47
Miscellaneous
1,006,898.99
866,000.81
827,996.24
826,295.03
Sub-totals
$11,906,978.95
$10,862,183.81
$ 9,297,726.00
$ 9,183,759.72
Stockholders' notes
1,781,800.00
1,780,150.00
1,780,150.00
1,780,150.00
Stock - Park Nat'l Bank
982,500.00
982,500.00
982,500.00
982,500.00
Totals
$14,671,278.95
$13,624,833.81
$12,060,376.00
$11,946,409.72
Assets not pledged to RFC: Assets pledged to Fed. Res. Bank
$ 121,987.81
$ 135,476.95
$ 138,746.99
Assets pledged to Park Nat'l Bank
176,345.75
Unpledged assets
544,094.87
460,227.23
343,542.67
$ 356,093.85
Assets deposited in escrow
325,962.16
39,769.47
Additional assets
1.00
1.00
1.00
1.00
Sub-totals
$ 1,168,391.59
$ 635,474.65
$ 482,290.66
$ 356,094.85
Bank balances
204,566.89
122,999.07
115,248.88
101,854.31
Totals
$ 1,372,958.48
$ 758,473.72
$ 597,539.54
$ 457,949.16
Deferred expenses
28,856.53
38,736.70
42,560.82
Totals
$16,044,237.43
$14,412,164.06
$12,696,652.24
$12,446,919.70
LIABILITIES
Trustees' liabilities: RFC
$ 6,926,944.62
$ 2,851,783.83
$ 1,677,550.53
$ 1,352,784.81
Other
130,178.76
304.44
Preferred claims and reserves
414,170.97
60,911.32
11,435.14
8,209.39
Claims - Fed. Res. Bank
15,326.56
135,172.40
9,229.92
9,229.92
Unsecured claims
6,054,664.93
5,885,875.64
5,914,698.83
5,913,569.68
Trustees' surplus
2,766,951.59
5,478,116.43
5,083,737.82
5,163,125.90
Totals
$16,044,237.43
$14,412,164.06
$12,696,652.24
$12,446,919.70
*34 On September 20, 1934, March 10, 1937, and September 20, 1939, the RFC representative made appraisals of each item of collateral held in pledge by RFC in order to establish the total anticipated recovery from the collateral held, and to determine whether the loan was adequately secured. The result of these appraisals were as follows: September 20, 1934
Amount
Anticipated
Collateral Held
(Book Value)
Recovery
Stockholders' notes
$ 1,781,800.00
$ 1,192,062.00
Stock - Park Na-
tional Bank
982,500.00
982,500.00
Other assets
11,921,488.28
6,391,795.00
Totals
$14,685,788.28
$ 8,566,357.00
March 10, 1937
Stockholders' notes
$ 1,780,150.00
$ 1,214,060.97
Stock - Park Na-
tional Bank
982,500.00
1,355,850.00
Other assets
10,881,972.59
3,831,840.08
Totals
$13,644,622.59
$ 6,401,751.05
September 20, 1939
Stockholders' notes
$ 1,780,150.00
$ 1,221,535.55
Stock - Park Na-
tional Bank
982,500.00
1,473,750.00
Other assets
7,894,031.37
1,689,797.20
Totals
$10,656,681.37
$ 4,385,082.75
The appraisals represented the personal judgment of the individual who made them. They were not open to the public but there were no objections or restrictions on the *35 part of RFC preventing the trustees from making public the results of the appraisals in summary form. The appraisal of September 20, 1939, was made at the request of the trustees, preparatory to their completing the payment of the RFC loan and taking over the administration of the collateral. Based upon this appraisal, the trustees, on September 20, 1939, published a printed report addressed to all parties interested in the plan, setting forth the financial condition of the trust. It was stated therein that the trustees had had the collateral appraised "and are now in a position to furnish you with results of this appraisal as the factors entering into it are, for the first time, sufficiently definite." The report further states that "on January 10, 1940, it has now been definitely determined that the stockholders' notes will be due for payment and the stock in the bank will accrue for the benefit of the unsecured depositors." On November 23, 1939, the petitioner paid its stockholders' note in the amount of $34,600. In January, 1940, the par value of the Park National Bank stock was reduced from $100 per share to $10 per share, and the number of shares increased from 10,000 to *36 100,000. On or about January 29, 1940, the trustees declared a distribution of 23.17 per cent of the unsecured creditors' claims, payable in Park National Bank stock, on the basis of $15 per share and distributed all of such stock in payment thereof. At the same time, a cash distribution, amounting to 8.83 per cent of the unsecured creditors' claims was paid, making a total distribution at that time of 32 per cent, and bringing the total distribution to unsecured creditors to 45 per cent. After paying 70 per cent of their claims to the unsecured creditors the trustees, on or about September 15, 1943, distributed all of the assets remaining in their hands to the stockholders who had paid their stockholders' notes in full, thereby completing the liquidation of the trust. This distribution amounted to 3.7401 per cent of the face value of the notes paid, the petitioner receiving on account thereof the sum of $1,294.08. The petitioner claimed as a loss deduction on its returns for both 1939 and 1940 the sum of $69,200, representing its original investment in the bank stock and the amount paid in discharge of the stockholders' note. The respondent disallowed the deduction for both years *37 on the ground that the stock became worthless prior to 1939. During the period from September 27, 1932 to January 6, 1933, the following purchase and sales transactions of the stock of the East Tennessee National Bank were handled by a local stock broker: Purchase
Sales
No. of
Price
Price
Date
Shares
Per Share
Per Share
September 27, 1932
50
$30.00
$32.00
December 17, 1932
200
8.50
11.50
December 24, 1932
13
8.00
15.00
January 4, 1933
200
5.25
9.87
January 4, 1933
85
5.25
10.59
January 6, 1933
29
11.00
13.45
The stock of the East Tennessee National Bank became worthless prior to 1939. The loss on account of the payment of $34,600 was sustained in 1939. Opinion VAN FOSSAN, Judge: The sole issue before us is whether the respondent was in error in disallowing for both 1939 and 1940 the loss claimed by petitioner growing out of its investment in the stock of the East Tennessee National Bank. The respondent contends that the stock became worthless in 1933, or, at any event, prior to 1939; that the petitioner's loss was sustained in the year in which the stock became worthless, and that consequently it is not entitled to the deduction either *38 in 1939 or 1940. The petitioner contends that its stock was never without value; that under the plan for reopening the bank the petitioner and the other stockholders guaranteed the creditors that assets placed in trust at that time would liquidate and pay 70 per cent of the unsecured creditors' claims by January 10, 1940; that the assets were insufficient for this purpose and that the petitioner was compelled to pay, and did pay, $34,600 in cash in 1939 in discharge of its guaranty; that it thereupon acquired a "claim over" for this amount against the trustees; that this "claim over" was worthless and that it is, therefore, entitled to deduct $34,600 as a bad debt in 1939, the year of payment. The petitioner argues further that in paying and discharging its guaranty the trustees, on January 29, 1940, sold or distributed for account of the petitioner, its stock in the Park National Bank for $29,950; that it thereupon acquired a "claim over" against the trustees for this amount; that since this claim was worthless, it is entitled to deduct $29,950 as a bad debt in 1940; and that since the stock was sold for less than its cost to the petitioner, it is entitled to deduct the difference, *39 or $8,650, as a capital loss in 1940. The facts do not support the petitioner in this argument as to the worthlessness of the stock. It should be noted at the outset that the petitioner's contention is largely based upon the theory that it was the owner of 3,460 shares of Park National Bank stock at the time of its sale. The fact is, however, that all outstanding stock in the closed bank was cancelled December 17, 1933, and that petitioner owned no stock in the Park National Bank in the taxable years, or at any other time. But even if we accept petitioner's assumption as true, it is apparent that there was no guaranty present. A guaranty is a promise by one to make good for the debt, default or miscarriage of another. The liability of a guarantor is secondary or collateral. There must first be a principal debt which is guaranteed; without a principal debt for which the guarantor is answerable there can be no guaranty. Howell v. Commissioner, 69 F.2d 447, and cases there cited. The trustees were not personally liable for the payment of 70 per cent of the claims of the unsecured creditors but were liable only in their representative capacity and *40 only to the extent of the assets in their hands. Their only obligation was to liquidate the trust assets for the benefit of the unsecured creditors to the extent that such assets were sufficient to satisfy their claims. It is equally clear that the petitioner's statutory liability was not of a creditor but was its own direct liability. The statute relating to the shareholder of national banks [1] provides in part: The stockholders of every national banking association shall be held individually responsible for all contracts, debts and engagements of such association, each to the amount of his stock therein at the par value thereof in addition to the amount invested in such stock. That the payments made in 1939 were made in discharge of the note covering this liability, cannot be questioned. The assets were insufficient to satisfy the claims of the unsecured creditors and the petitioner and the other stockholders thereupon were compelled to pay the notes to supply the deficiency under their statutory liability. Furthermore, the petitioner had no "claim over" against the trustees. Its right to share in the assets remaining *41 after the payment of creditors' claims was merely a means by which its liability and loss would be measured. The petitioner thus did not acquire a fixed claim payable at all events. Petitioner's contention as to the stock ownership and its "claim over" must be denied. Howell v. Commissioner, supra. The respondent contends that the stock of the bank became worthless prior to 1939 and that the petitioner is not entitled to the deduction in either of the years before us. We sustain this view. A loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is actually sustained. The evidence in the case at bar shows that at the time the bank closed, or shortly thereafter, its liabilities and estimated expenses of receivership exceeded its assets by $6,418,982.43. It is apparent that the bank was then insolvent and that the stock, therefore, had no liquidating value. Consequently, in order to avoid a determination that the stock became worthless at that time the petitioner must show that, despite the loss of any liquidating value, there still remained a real potential value through the continued *42 existence of a reasonable expectation that the stock would become of value. James A. Connelly, 42 B.T.A. 237; Joseph H. McNabb, 42 B.T.A. 444; Sterling Morton, 38 B.T.A. 1270. This expectation could be realized only if the plan for reopening the bank would bring about a recovery on the stock. On careful reading of the record we are unable to find any basis for holding that such a recovery was possible or that any value, either real or potential, remained in the stock after 1934. The appraisals made by the RFC field representative in 1934 and 1937 show that the expected recovery on the assets was insufficient to satisfy the claims of the unsecured creditors and that the assessment notes would have to be paid to satisfy them. Under the plan, the amounts paid by the stockholders on their assessment notes would have to be repaid before any recovery could be had on their stock. Under such circumstances it was patent at that time that no recovery could ever be had. The statement made by the trustees in 1938 in their answer to charges of malfeasance show that by that time they had lost all hope *43 of any recovery on the stock of the closed bank. The burden is upon the petitioner to show that its stock had value at the beginning of 1939. This it has wholly failed to do. The petitioner argues further that its ownership of the East Tennessee stock alone was not the sole criterion for determining when its investment became worthless. It recites the facts that the stock had a market value in 1933 and that, pursuant to the plan, it exchanged its East Tennessee stock for Park National stock. The Park National stock was admittedly valuable during the relevant period. Therefore, the petitioner argues, it suffered no loss until 1940, when (it contends) the stock was sold and it had no possible means of recoupment. The plan for reopening provided that participating stockholders should transfer all their stock in the closed bank to the trustees and that they specifically directed the trustees to surrender their interest therein to the unsecured depositors unless 70 per cent of the latter's claims had been paid by January 10, 1940. It was provided that if all prior liens had been paid and the unsecured depositors had received 70 per cent of their claims by January 10, 1940 without resort *44 to the stockholders' notes, then the notes and collateral of the stockholders were to be returned to them and the trustees should transfer all Park National stock remaining in their hands to the stockholders of the closed bank in proportion to the amount of stock deposited by each. The stock of the closed bank was cancelled in 1933 and the stock of the reopened bank was issued in the names of, and delivered to, the trustees who pledged it as security to RFC and carried it on their books as an asset. Under similar facts we held in Estate of C. T. Grant, 36 B.T.A. 1233, that the stockholders of the closed bank acquired no interest in the stock of the reopened bank. In that case the stock of the resuming bank was issued in the names of the stockholders of the closed bank. Under the plan of reorganization adopted, the stock was set aside and placed in the hands of the superintendent of banks as security for the payment of 75 per cent of the claims of the depositors and for the payment of the claims of the general creditors of the old bank. It was provided that the old stock should be void and of no effect after the resumption of business; that if, within *45 three years after the resumption of business, the depositors and other creditors had not been fully paid, the superintendent of banks should sell and dispose of such numbers of shares as might be required to complete full payment and should distribute any unsold shares pro rata among the persons entitled thereto; and that if, when all depositors and creditors of the bank had been fully paid, it was ascertained that any stockholder had paid more than his pro rata shares, the Superintendent of Banks should, out of any assets in his control, including the unsold stock of the resuming bank, make any adjustment thereof. It was contended that this plan constituted a reorganization; that the stockholders had exchanged their old stock for the new; and that no gain or loss was recognizable until the disposal of the new stock. On that point we said: Whether there was a recapitalization of the bank and hence a reorganization under the Revenue Act need not be decided. The stockholders gave up nothing and nothing was delivered to them. * * * The stock of the resuming bank, though issued in the names of the old stockholders as a matter of convenience, was nevertheless owned by the superintendent *46 of banks in his representative capacity. He, as the owner of the assets of the bank, had pledged such shares for the purpose of securing the funds forming the capital and surplus of the resuming bank * * *. Nor did the consenting stockholders give up their stock in the closed bank or surrender their certificates therefor. If peradventure, the liquidation of the closed bank should result in the collection of funds sufficient to pay all of its liabilities, the excess, if any, would belong to the stockholders; for the resuming bank was merely the agency selected by the superintendent of banks to aid him in the liquidation * * *. We think the present case is indistinguishable in principle from the Grant case, supra. The facts in the Grant case were in fact stronger for the petitioner than those present here, in that the new stock there was issued in the names of the stockholders of the closed bank. We conclude, therefore, and hold that the stock of the East Tennessee National Bank became worthless prior to 1939; that the petitioner sustained its loss thereon in the year in which it became worthless; and that it is not entitled to the deduction claimed on account of the *47 stock, either for 1939 or 1940. The amount paid by petitioner on account of the assessment note presents a different problem. Ordinarily the payment of an assessment on bank stock is considered to be a contribution to capital, any loss suffered being deductible when the stock is sold or becomes worthless. First National Bank of Wichita v. Commissioner, 46 F.2d 283; Porter Property Trustees, Ltd., 42 B.T.A. 681. Petitioner's case, however, does not present the usual situation. Petitioner was under a statutory liability to pay the 100 per cent assessment levied against it in April 1933, payable on or before May 12, 1933, but, by agreement with the Comptroller of the Currency, that liability was made contingent by the giving of a note dated May 11, 1933, which, though payable on demand, was not to be called prior to January 10, 1940, if the trustees realized enough to pay 70 per cent of the unsecured creditors' claims from the liquidation of other assets which they held. If the plan of reorganization had not been entered into the statutory liability would have been accruable in 1933, all the events determining such *48 liability and fixing its amount having occurred in that year. However, the note was substituted for the statutory liability and, under the terms of the plan of reorganization, all of the necessary events did not occur until it became necessary for the trustees to sell the note. Such a call was made in November 1939, effective January 10, 1940. Then it became certain that petitioner would be obliged to make payment on account of the original statutory liability as represented by the note. Petitioner paid $34,600 on November 23, 1939 in discharge of the note. Thus, in 1939, for the first time, petitioner, under the peculiar facts here present, could properly accrue the liability. Under these facts also it then became apparent the petitioner would sustain a loss on account of such assessment. We are of the opinion that petitioner's claim for a loss on account of the assessment note in the year 1939 should be sustained and we so hold. That such a loss was actually sustained is confirmed by the fact that in 1943, on liquidation of the trust, petitioner received as a final distribution the sum of $1,294.08, being the value of assets distributed to it on such final liquidation. Such recovery *49 did not serve to lessen the amount of the loss sustained in 1939 but should be accounted for in the year of receipt. Decision will be entered under Rule 50. Footnotes
1. 12 U.S.C.A. 64↩.